```
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
_____

In re:
                                          CASE NO. 03-20001
GERALD F. HOYT and
CAROLYN M. HOYT,

                       Debtors.           DECISION & ORDER
_____

IBA, INC.,

                       Plaintiff,

           V.                             AP #05-2023

GERALD F. HOYT,

                       Defendant.
_____
```

## BACKGROUND

On January 2, 2003, Gerald F. Hoyt ("Hoyt") and Carolyn M. Hoyt (collectively, the "Debtors"), filed a petition initiating a Chapter 13 case that was converted to a Chapter 7 case on November 3, 2004.

On February 25, 2005, IBA, Inc. ("IBA"), which asserted a claim against Hoyt for in excess of $300,000.00 (the "IBA Obligation"), filed an Adversary Proceeding (the "IBA Adversary Proceeding") which requested that the Court: (1) find the IBA Obligation to be nondischargeable pursuant to Section 523; and (2) deny Hoyt's discharge pursuant to Section 727.

On March 29, 2005 Hoyt filed a Motion to Dismiss IBA's Section 523 nondischargeability causes of action.

In a June 27, 2005 Decision & Order, a copy of which is attached (the "523 Decision"),[1] the Court dismissed IBA's Section 523(a)(4) and Section 523(a)(6) nondischargeability causes of action for failure to state a claim upon which relief could be granted.

As and for a cause of action under Section 727(a)(2)(A), IBA asserted in its Complaint in the IBA Adversary Proceeding that within one year prior to the filing of his petition, Hoyt had transferred and concealed, or permitted to be transferred and concealed, approximately $60,000.00 in proceeds from the sale of his former Colorado residence.

As and for a cause of action under Section 727(a)(4), IBA asserted in its Complaint in the IBA Adversary Proceeding that in his Original Schedules and Statement of Financial Affairs, Hoyt knowingly and fraudulently made false oaths concerning: (1) the income he received in the two years prior to the filing of his petition, including the proceeds he received from the sale of his former Colorado residence; (2) the amount of money on deposit in his checking account at Pittsford Federal Credit Union on the date

---

[1] The 523 Decision sets forth a detailed background of the business dealings between Hoyt and IBA in Colorado that gave rise to the IBA Obligation.

of the filing of his petition; (3) the value of his interest in household goods; and (4) his monthly income.

On July 19, 2005, Hoyt filed a Motion for Partial Summary Judgment which requested that the Court dismiss the Section 727(a)(2)(A) cause of action. On August 3, 2005, the Court denied the Motion.

On November 30, 2005, the Court conducted a trial (the "Trial") at which Hoyt and Hope Olsson, Esq. ("Olsson"), the attorney who represented the Debtors at the time of the filing of their petition, testified.

---

### DISCUSSION

I. **Section 727(a)(4) Causes of Action**

   A. **Statute and Case Law**

Section 727(a)(4)(A) provides that:

(a) The court shall grant the debtor a discharge, unless -

   (4) the debtor knowingly and fraudulently, in or in connection with the case -

      (A) made a false oath or account[.]

11 U.S.C. § 727 (2006).

From the cases which have been decided under Section 727(a)(4)(A), including this Court's Decisions & Orders in *In re*

*Pierri,* Ch. 7 Case No. 97-20461, A.P. Case No. 97-2125 (W.D.N.Y. April 21, 1998), *In re Wackerman,* (Chapter 7 Case No. 99-20709, W.D.N.Y. November 27, 2000) ("*Wackerman*"), In *re Ptasinski* (Chapter 7 Case No. 02-20524, A.P. Case No. 02-2172, W.D.N.Y., February 13, 2003), *In re Weeden* (Chapter 7 Case No. 02-23812, A.P. Case No. 03-2003, W.D.N.Y. February 17, 2004), *In re Foxton* (Chapter 7 Case No. 04-22377, A.P. Case No. 04-2154, W.D.N.Y. April 12, 2005), *In re Mondore* (Chapter 7 Case No. 04-21316, A.P. Case Nos. 04-2124 and 04-2130, W.D.N.Y. June 14, 2005) and *In re Hutchinson* (Chapter 7 Case No. 04-25436, A.P. Case No. 05-2027, W.D.N.Y. August 2, 2005), we know that for the Court to deny a debtor's discharge because of a false oath or account: (1) the false oath or account must have been knowingly and fraudulently made, *see Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244 (4th Cir. 1994); (2) the required intent may be found by inference from all of the facts, *see 6 L.King, Collier on Bankruptcy*, ¶727.04[1][a] at 40 (15th ed. rev. 2005); (3) a reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may rise to the level of the fraudulent intent necessary to bar a discharge, *see In re Diorio*, 407 F.2d 1330 (2d Cir. 1969); (4) a false statement resulting from ignorance or carelessness is not one that is knowing and fraudulent, *see Bank*

**Page 4**

*of Miami v. Espino (In re Espino),* 806 F.2d 1001 (11th Cir. 1986); (5) the required false oath or account must be material; and (6) the required false oath or account may be a false statement or omission in the debtor's schedules or a false statement by the debtor at an examination at a creditors meeting, *see In re Ball*, 84 B.R. 410 (Bankr. D.Md. 1988). Conversely, if items were omitted from the debtor's schedules because of an honest mistake or upon the honest advice of counsel, such a false declaration may not be sufficiently knowingly and fraudulently made so as to result in a denial of discharge.

### B. <u>Balance on Deposit at the Pittsford Federal Credit Union</u>

Included in Exhibit "2" at Trial was a January 31, 2003 Pittsford Federal Credit Union Statement of Account (the "PFCU Statement") for the Debtors' joint combined checking and savings account Number 682 (the "Account"). This Statement showed a series of transactions posted on January 2, 2003, including: (1) withdrawal check no. 01018066 in the amount of $8,500.00; (2) withdrawal check no. 01018067 in the amount of $708.33; and (3) the purchase of traveler's checks in the amount of $1,000.00.

Hoyt testified at Trial that: (1) in connection with the filing of their petition, the Debtors advised Olsson that they had approximately $12,000.00 on deposit at Pittsford Federal Credit

Union;[2] (2) he "understood" Olsson to have advised the Debtors that they could use those funds for expenses, but that they should leave a $100.00 balance in each of the savings and checking portions of the Account, which would be the amount they would report on their Schedules; (3) the transactions posted to the PFCU Statement on January 2, 2003, the date of the filing of the Debtors' petition, were actually made on December 31, 2002, the day the Debtors executed their petition; (4) the Debtors were in possession of the $1,000.00 in traveler's checks that they purchased from the Pittsford Federal Credit Union on both December 31, 2002 and January 2, 2003, and they subsequently used them when they traveled to Colorado from January 6 through January 11, 2003; (5) the $8,500.00 withdrawal check was: (a) ultimately deposited by the Debtors into their daughter's bank account so that it would be available to them for the payment of future expenses, since they did not know what income they might be receiving during the early stages of their Chapter 13; and (b) either in their possession on December 31, 2002 and January 2, 2003, or by January 2, 2003, it had been deposited into their daughter's bank account; (6) the withdrawal check for $708.33 was for cash and it was in the Debtors' possession on both December 31, 2002 and January 2, 2003;

---

[2] The PFCU Statement shows that they had in excess of $17,000.00 on deposit, but approximately $12,000.00 was on deposit in the checking portion of this combined joint account.

Page 6

and (7) he did not know why these assets were not listed on Schedule B of his Original Schedules, signed on January 16, 2003, but which set forth the Debtors' assets as of the petition date (the "Initial Schedules"), under either: (a) Item No. 1, as cash; (b) Item No. 14, as a negotiable instrument; (c) Item No. 33, as other personal property of any kind not already listed; or (d) any other Item of Schedule B.

From the evidence produced at Trial, including the testimony of Hoyt and Olsson, and the pleadings and proceedings in Hoyt's bankruptcy case and in the IBA Adversary Proceeding, I find that Hoyt's failure to schedule, or otherwise disclose at his initial 341 Meeting, his interest, as of the date of the filing of his petition, in the traveler's checks, withdrawal checks and/or money on deposit in his daughter's bank account constitutes a knowingly and fraudulently made false oath, for which his discharge must be denied. Furthermore, at a minimum, his actions in failing to schedule these assets demonstrated such a reckless disregard of the serious nature of: (1) complying with his duties under Section 521[3]

---

[3] Section 521 provides, for cases filed before October 17, 2005, in part:

> The debtor shall—
>
> (1) file a list of creditors, and unless the court orders otherwise, a schedule of assets and liabilities, a schedule of current income and current expenditures, and a statement of the debtor's financial

**Page 7**

to pay the necessary attention to the detail and accuracy required to properly complete his Initial Schedules, that the necessary fraudulent intent has been demonstrated by a preponderance of the evidence.

In this regard, the Court completely rejects the assertions made by Hoyt and his counsel in the IBA Adversary Proceeding that his failure to properly schedule or disclose these assets was not knowing, intentional or fraudulent, because: (1) he was mentally and emotionally distressed at the time of the filing of his petition and the execution of his Initial Schedules as the result of the loss of his Colorado business; and (2) he should somehow be accountable only for the advice that "he thought he heard" Olsson give him, rather than for the actual advice Olsson testified that she gave him.

In this regard, this Court has consistently and clearly stated in many of its prior Section 727 denial of discharge Decisions & Orders that it is this Court's expectation that debtors, no matter what is going on in their lives at the time they review and sign

---

        affairs; and

  (3)  if a trustee is serving in the case, cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties under this title.

11 U.S.C.A. § 521 (2005).

**Page 8**

their bankruptcy schedules, must give their one-hundred percent attention to reading, reviewing, analyzing and executing those schedules in order to insure that they are complete and correct.[4] Furthermore, this Court has always held businesspeople, like Hoyt, to a higher standard of sophistication and responsibility when it comes to reading, reviewing, analyzing and executing their bankruptcy petition, schedules and statements in order to insure that they are complete and correct.

Olsson testified at Trial that: (1) the Debtors, including Hoyt, specifically advised her that there was only a few thousand dollars on deposit at the Pittsford Federal Credit Union; and (2) her advice to them was to reduce that balance down to $100.00 by using the funds to pay any expenses currently due, such as a

---

[4] In 2002, in *Wackerman*, the Court stated:

> Further, as this Court has clearly stated on numerous occasions to debtors and their attorneys, notwithstanding all of the financial and perhaps personal difficulties that a debtor may be experiencing, the Bankruptcy Code expects that when debtors and their attorneys are finalizing and signing their schedules, they will devote their full attention to them in order to ensure that they are complete and accurate to the best of the debtors' knowledge and information. Complete and accurate schedules are necessary for a trustee and creditors to be able to fully understand a debtor's financial affairs so that non-exempt assets can be realized upon, and, if appropriate, prior transactions of a debtor avoided for the benefit of the estate. If the schedules are not complete and accurate, Section 727 was enacted, in part, to prohibit a discharge and a fresh start for those who "play fast and loose with their assets or with the reality of their affairs." *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987).

currently due and owing mortgage payment or currently due and owing attorneys' fees, knowing that they might in fact have had "a few thousand dollars" of such currently due expenses.

Hoyt's assertion that he "heard" or interpreted Olsson to say that the Debtors could use the nearly $17,000.00 on deposit in Pittsford Federal Credit Union for any expenses, whether currently due and owing or anticipated in the future, is absolutely ridiculous, and is perhaps the most ridiculous assertion that I have heard a debtor make in the fourteen years that I have been on this Court. No one, especially a sophisticated businessman, could possibly believe that the Bankruptcy Code, Rules and System would allow a debtor to retain, to the detriment of his or her creditors, and never have to disclose, over $10,000.00 in cash and cash equivalents they had in their possession or under their control when they filed their petition, so that they could use those assets to pay future post-filing expenses.

This case also illustrates how critical it is that debtors and debtor's attorneys understand that debtors who give their attorneys intentionally false or incomplete information can never honestly rely on any advice that attorney gives to them based upon that information. It is this Court's unfortunate experience that many individuals intentionally do not ask their attorneys questions that they know they do not want the answers to. Rather, they ask very

carefully crafted questions, often based at least in part upon incorrect or incomplete information, and then claim that they should be able to rely upon the answers they receive. Not so in this Court.

Furthermore, having observed Hoyt during his testimony at Trial, I find his testimony concerning his mental and emotional distress and his belief that Olsson advised him that he could retain and use funds on deposit at Pittsford Federal Credit Union for future, rather than currently due expenses, to be totally without credibility.

Although not specifically pled in IBA's Section 727(a)(2)(A) cause of action, as the Court explained at Trial, any and all aspects of the Account could be considered by the Court for Section 727 denial of discharge purposes, since the amounts in existence or on deposit in the Account were made an issue by the IBA pleadings in the Section 727(a)(4) cause of action included in the IBA Complaint. In this regard, the transfer and concealment of the $8,500.00 withdrawal check, in which Hoyt had an interest, that was deposited into Hoyt's daughter's bank account, is also grounds for the denial of his discharge under Sections 727(a)(2)(A) and (B), as a transfer and concealment of property of the debtor or property of the estate with an intent to hinder, delay and defraud creditors and his trustee.

Page 11

**C.     Household Goods and Furnishings and Collectibles**

Schedule B of the Debtors' Initial Schedules, among other assets, required them to set forth the "current market value" of: (1) Item No. 4 - Household goods and furnishings, including audio, video and computer equipment ("Household Goods"); and (2) Item No. 5 - Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles ("Collectibles").  The Debtors scheduled their Household Goods as having a current market value of $2,300.00 and their Collectibles, including coins and baseball cards, as having a current market value of $5,000.00, for a total combined current market value of $7,300.00.

Exhibit "1" at Trial was a December 11, 2002 Personal Financial Statement given by the Debtors to The First National Bank (the "December Financial Statement").  On this December Financial Statement, dated twenty days prior to the filing of their bankruptcy petition, the Debtors indicated that their Household Goods and Collectibles had a value of $67,000.00, as follows:  (1) baseball and football card collection - $5,000.00; (2) household furnishings - $53,000.00; (3) coin collection - $1,000.00; and (4) oriental rugs - $8,000.00.

When invited to explain both this discrepancy in value and the failure to separately disclose the Debtors' oriental rugs, which

**Page 12**

were separately classified and valued at $8,000.00 in the December Financial Statement, Hoyt testified at Trial that: (1) he did not prepare the December Financial Statement and only scanned it when he signed it on December 11, 2002, at a time when he was depressed and had no real idea of what he was doing; (2) he could offer no reason in response to the Court's questioning as to why the Debtors' coin and card collections were valued at $6,000.00 on the December Financial Statement but only at $5,000.00 on the Initial Schedules; and (3) he had helped his wife develop the $2,300.00 value for the Household Goods by estimating the garage or fire sale value of their property, based upon the advice of Olsson.

It does not appear from Hoyt's testimony at Trial that he ever advised Olsson about the December Financial Statement in connection with her advice as to how to value Household Goods and Collectibles, even though the Financial Statement does not set forth the basis for the valuation requested, the Initial Schedules indicated that the value is to be the "Current Market Value" and the "Client Questionnaire" that the Debtors completed for Olsson in connection with their bankruptcy, Exhibit "A" at Trial, indicated that the Debtors should "think of the market value as the resale value."

It is commonly asserted by attorneys practicing in this Court that, although when they were borrowers, debtors may have used the

**Page 13**

highest possible fair market value for their household goods when preparing a financial statement for borrowing purposes, and later in connection with their bankruptcy scheduled the lowest possible value for the same property, often at the low end of a liquidation value, this practice is not inconsistent, because Trustees only look at the liquidation value of assets. Nevertheless, the difference between the Debtor's valuation of $7,300.00 on their Initial Schedules and $67,000.00 on their December Financial Statement is simply too great a disparity for Hoyt to have failed to: (1) question the propriety of the $7,300.00 valuation; and (2) disclose, either on the Initial Schedules or to his Trustee at his 341 Meeting, the values that he had placed on his Household Goods and Collectibles a mere twenty days before his petition.

    Subsequent to the filing of the their petition, the Debtors obtained an appraisal (the "Reynolds Appraisal") of their Household Goods and Collectibles at an aggressive liquidation value as of July 1, 2003,[5] Exhibit "9" at Trial, which indicated that these

---

[5] The Reynolds Appraisal defined liquidation value as follows:

> Liquidation Value is defined as the most probable price estimated in terms of money which the property will bring if exposed for immediate sale, where there is pressure or compulsion to sell; a forced sale. The resulting value represented frequently can be less than Market Value because of the sale urgency.

> Liquidation Value has also been defined as the most probable or lesser amount of money that the seller receives for his goods than he would under normal selling conditions.

Page 14

assets had a liquidation value of $10,800.00, presumably to demonstrate either that the Debtors' valuation was not false and/or that any false statement that they may have made was not material, since it showed only $800.00 of non-exempt value in the assets (New York State has a $5,000.00 per person in bankruptcy exemption for household goods). N.Y. Debtor & Creditor Law § 283 (2006).

This discrepancy in the value of the Household Goods and Collectibles between that set forth on the December Financial Statement and that set forth on the Initial Schedules, which Hoyt failed to disclose in his Initial Schedules or to his Trustee at his 341 Meeting, is yet another example of a debtor playing fast and loose with the reality of their financial affairs and not being the honest and forthcoming debtor entitled to a discharge.

Although this in itself might not be sufficient to deny Hoyt's discharge, because of an apparent confusion among debtor's attorneys and Trustees as to what the valuation standard for Household Goods and Collectibles should be within the realistic ranges of liquidation values in cases before October 17, 2005, it once again demonstrates a pattern of Hoyt's failure to completely, accurately and honestly disclose his assets and their values and his overall financial affairs.

In this regard, no one has ever asked this Court to resolve the apparent conflict between the Schedules, which require

valuation at current market value, and the alleged expectation of the Panel of Trustees in the Rochester Division, which is that personal property should be valued on a debtor's schedules at a liquidation or "garage sale" value, especially at such an aggressive liquidation value as described in the Reynolds Appraisal or the garage sale value determined by the Debtors which was twenty-five percent lower than even the Reynolds liquidation value.

If it did not become apparent at Trial that Hoyt's discharge would be denied because of his false oaths regarding his interest in cash and cash equivalents, the Court would have inquired much deeper into the true value of his interest in oriental rugs, only five of which were included in the Reynolds Appraisal, and his failure to separately schedule them.

### D.  **Miscellaneous Inconsistencies**

Hoyt's failure to include the proceeds of the sale of his Colorado residence in his income for the year prior to the filing of his petition on his Initial Schedules, although his testimony indicated that he included it on the Client Questionnaire, and his arguable overstatement of the income that he might be receiving during his Chapter 13 from his former Colorado business, once again does not constitute sufficient false oaths to deny Hoyt a discharge, but the failure to insure that the Colorado Residence income was the same on the Client Questionnaire and on his Initial

Page 16

Schedules, demonstrates that same pattern of a failure to comply with his duties under Section 521 to pay the necessary attention to the detail to completely, accurately and honestly complete his Initial Schedules. The projected post-petition income, although an overrated projection based upon the facts and circumstances, does not appear to be fraudulent.

Hoyt has clearly proved himself not to be the honest but unfortunate debtor who has made a good faith attempt to fully disclose his financial affairs.

## CONCLUSION

The discharge of the Debtor, Gerald F. Hoyt, is hereby denied pursuant to Section 727(a)(2)(A) and 727(a)(4) for the reasons more fully set forth in this Decision & Order.

**IT IS SO ORDERED.**

                                                /s/
                                  **HON. JOHN C. NINFO, II**
                                  **CHIEF U.S. BANKRUPTCY JUDGE**

**Dated: February 8, 2006**